**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-6

SAMMIE LOUIS STOKES,

Petitioner – Appellant,

v.

BRYAN P. STIRLING, Director, South Carolina Department of Corrections;
MICHAEL STEPHAN, Warden of Broad River Correctional Institution,

Respondents – Appellees.

Appeal from the United States District Court for the District of South Carolina, at Aiken.
R. Bryan Harwell, Chief District Judge. (1:16-cv-00845-RBH)

Argued: May 6, 2021            Decided: August 19, 2021

Before GREGORY, Chief Judge, HARRIS, and QUATTLEBAUM, Circuit Judges.

Reversed and remanded by published opinion. Chief Judge Gregory wrote the opinion, in which Judge Harris joined. Judge Quattlebaum wrote a dissenting opinion.

**ARGUED:** Paul Alessio Mezzina, KING & SPALDING LLP, Washington, D.C., for Appellant. Michael Douglas Ross, OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA, Columbia, South Carolina, for Appellees. **ON BRIEF:** Diana L. Holt, DIANA L. HOLT, LLC, Columbia, South Carolina; Michele J. Brace, VIRGINIA CAPITAL REPRESENTATION RESOURCE CENTER, Charlottesville, Virginia; Ashley C. Parrish, Joshua C. Toll, Isra J. Bhatty, Edward A. Benoit, KING & SPALDING LLP, Washington, D.C., for Appellant. Alan Wilson, Attorney General, Donald J. Zelenka, Deputy Attorney General, Melody J. Brown, Senior Assistant Deputy Attorney General, OFFICE OF THE

ATTORNEY GENERAL OF SOUTH CAROLINA, Columbia, South Carolina, for Appellees.

_____

GREGORY, Chief Judge:

Sammie Louis Stokes confessed to capital murder, putting mitigation of the death penalty at the heart of his defense. His trial counsel prepared some personal mitigation evidence but, at the last minute, withheld it. Instead, counsel presented a single witness at sentencing: a retired prison warden who was unprepared and counterproductive. The jury returned a death sentence without hearing a word from the defense about Stokes as an individual. In postconviction proceedings, new counsel found more information about Stokes's traumatic upbringing, but failed to pursue a mitigation-based ineffective assistance of counsel claim. We conclude that postconviction counsel were ineffective, providing good cause for Stokes's procedural default of such a claim. On the merits, we find that trial counsel's failure to adequately investigate and present personal evidence was objectively unreasonable and prejudicial. We reverse the district court order dismissing Stokes's petition and remand for issuance of the writ unless the State grants resentencing.

I.

A.

Stokes's childhood in Branchville, South Carolina was marked by extreme abuse and neglect. His parents were serious alcoholics. Stokes initially lived with his father. He met his mother, Pearl, for the first time when he was four years old. When he was five, Stokes went to live with Pearl and met his sister Sara for the first time.

Pearl lived with a man, Richard, whom the kids regarded as a stepfather. As one relative put it, the family lived in a "run-down wooden shack" without running water or

indoor plumbing. Richard and Pearl sometimes took the children along to clubs and bars, and other times the children were left unsupervised. Stokes and Sara often skipped school and sometimes stole food from neighbors to eat. On some weekends, they stayed with their paternal grandmother, who ran a liquor house and brothel out of her home. When Stokes was nine years old, his father died suddenly on the front lawn, where Stokes saw his body. Afterwards, the kids lived with Pearl and Richard permanently.

The children witnessed and suffered physical and sexual abuse. Richard sexually abused Sara, regularly and openly. When Sara was as young as 13 years old, Pearl sometimes "gave" Sara to men as "payment" in exchange for car rides. Stokes was disciplined by whippings with an extension cord. Pearl and Richard fought explosively. One witness recalled Pearl being hospitalized after Richard broke a bottle over her head; Stokes recalled Richard breaking her jaw. When Stokes was 13, he witnessed his mother, on the couch, intoxicated, as she fell into a coma and then died, leaving Stokes parentless.

Stokes remembers his mother's death as a point when his life turned for the worse. Stokes and Sara briefly lived with an aunt but ultimately chose to live unsupervised with Richard. Stokes began using drugs and alcohol. He attended under-resourced schools where his failure to progress was ignored. Stokes repeated the eighth grade three times, yet only stopped attending school at age 18, when he was in the ninth grade. Around age 11 or 12, Stokes had been sexually abused by a babysitter. Thereafter, he had many sexual encounters, and at age 15, impregnated two partners. At that same age, a "relationship" began between Stokes and Audrey Smith, a friend of his mother's, who was almost ten

4

years older than him. Stokes was "obsessed" with Smith, and their relationship was often tumultuous. When Stokes was 18 and Smith was 27, they married.

According to the child development expert retained by Stokes's federal counsel, these facts amount to an extraordinarily traumatic childhood that impaired Stokes's future emotional regulation and social adaptation.[1]

B.

In 1988, Stokes was convicted of assaulting Smith with a knife. Soon after his release in 1990, the couple became involved again. Before long, Stokes assaulted Smith for a second time, choking her in a park and leaving her unconscious. He was convicted of that assault in 1991 and sentenced to ten years. While serving the sentence, in 1998, Stokes was cellmates with Roy Toothe. Toothe's mother, Pattie Syphrette, lived with his children and their mother, Connie Snipes. Syphrette wanted to gain custody of her grandchildren by having Snipes killed. Stokes agreed to carry out the murder for $2,000.

Stokes was released from prison several months later. Within weeks, he and Syphrette met to make plans. Syphrette falsely told Snipes that she had kidnapped and planned to murder Doug Ferguson, a man who sometimes lived with them. Syphrette invited Snipes to join, and Snipes agreed. Stokes also invited Norris Martin, a longtime

---

[1] The expert, Dr. James Garbarino, applied the Centers for Disease Control and Prevention's well-known "Adverse Childhood Experiences" (ACE) standard to quantify the adversity Stokes experienced on a ten-point scale. According to Dr. Garbarino, only 13 percent of the population have an ACE score of four or greater, with less than one percent scoring seven or greater. Based on his evaluation, Dr. Garbarino concluded Stokes has an ACE score of nine, meaning he was exposed to more childhood adversity than 999 out of 1,000 individuals on average. *See generally* J.A. 2173–2201.

5

friend from childhood. Martin, who has an intellectual disability, was a "follower" of Stokes growing up. Snipes went with Syphrette, Stokes, and Martin on a drive to an isolated area. While Syphrette waited by the car, Snipes walked with Stokes and Martin into the woods. Though the factual accounts differ about exactly what happened next, it is undisputed that Stokes drew a gun and held Snipes at gunpoint; Martin raped Snipes, followed by Stokes; and Martin and Stokes each shot Snipes once in the head, killing her. When a car passed nearby, they fled, leaving the body in the woods where it was found days later. At the scene, police found a hat, knife, and wallet belonging to Martin. The group was arrested soon after, and Stokes penned a detailed confession in county jail.

Martin later testified to further details about the crime. According to Martin, Stokes instigated the rape and murder of Snipes; Stokes was especially abusive, anally raping Snipes and using Martin's knife to mutilate her breasts; Stokes pushed the gun into Martin's hand and forced him to pull the trigger; and Stokes mutilated the corpse, cutting off a portion of the scalp and cutting off the genitals.

The jury also heard about the subsequent murder of Doug Ferguson. In the days after the Snipes murder, Syphrette feared Ferguson's knowledge of her plans to murder Snipes. Syphrette enlisted Stokes and a friend, Faith Lapp, to kidnap Ferguson. The group had bound Ferguson with duct tape when police arrived at Syphrette's home. Ferguson died of suffocation from his bindings. In a subsequent prosecution, Stokes pleaded guilty to Ferguson's murder.

6

## C.

In 1998, the trial court appointed Thomas Sims as Stokes's lead counsel and Virgin Johnson as second chair. The lawyers were former prosecutors with several years of experience in private practice. They had some limited death penalty experience, but little to no experience preparing a mitigation defense. Trial preparation spanned nine months. Sims and Johnson began preparing mitigation evidence six months in. Trial counsel's efforts on the mitigation investigation totaled around 45 hours out of the hundreds they billed. They hired their fact investigator's receptionist as the mitigation investigator, though she had no prior experience with mitigation investigations. She was conducting an interview the same day that the jury reached its initial verdict.

The guilt phase of the trial began on October 25, 1999. The parties agreed to restrict the guilt phase to a bare recitation of the facts and reserve any aggravating facts about the crime for the penalty phase. Four days later, the jury returned a guilty verdict after an hour's deliberation. For the penalty phase, trial counsel decided to focus on prison adaptability: they planned to argue that Stokes's health condition made him especially suitable for a life sentence. Stokes was HIV-positive. His health was declining significantly around this time; he even needed an emergency blood transfusion in the days before trial. Trial counsel retained a neurologist who was prepared to testify to evidence of brain damage possibly caused by AIDS. They also prepared a forensic psychiatrist to testify that Stokes was likely to imminently die of AIDS in prison.

Stokes was hesitant about this strategy, and trial counsel knew it. They repeatedly intervened to secure his consent. For example, a memorandum by the mitigation

7

investigator describes a "very tense meeting" with Stokes five days before trial, in which Stokes opposed disclosing his HIV status. J.A. 2544. She secured his approval on the condition that the courtroom be cleared when the issue would be discussed. Ultimately, though, on the eve of sentencing, Stokes withdrew his consent, refusing to allow his counsel to mention his HIV status under any circumstances.

Still, the defense team had other evidence ready. Their investigation had not uncovered the full extent of Stokes's life story, but they knew the broad outlines. At the start of sentencing, Stokes's sister and aunt were on the witness list and prepared to testify. The same was true of the psychiatrist and neurologist, as well as a social worker who was prepared to testify about Stokes's psychological profile. However, in another last-minute decision, trial counsel decided not to present any personal evidence about Stokes.

In post-conviction testimony, Sims and Johnson explained that they reached this decision based on their impressions of the jury from the guilt phase, knowing that the worst details of the crimes were yet to come. They believed that "an Orangeburg County jury" "back in '97, '98, '99, when this was going on," would not be receptive to evidence about "the background of the individual and the kind of life that they had had as a child" after hearing the prosecution's case in aggravation. J.A. 3469–73; J.A. 3423–25. Trial counsel was also mindful of the jury's racial composition and "certain inner biases" that they believed would follow. J.A. 3523–24. They believed white jurors might react especially to Stokes, a Black man, raping Snipes, a white woman. And for Black jurors, especially "with the older Black females during that time," there was "this whole idea of homosexuality." *Id.*; J.A. 3520–21 ("AIDS, homosexuality . . . during that time there was

8

a prejudice and a bias against it."). On this basis, trial counsel declined to present any background evidence about Stokes and proceeded with their prison adaptability approach. But because Stokes withdrew consent to present evidence related to his HIV status, this approach amounted to a single witness, James Aiken, offered as an adaptability expert.

Aiken was a retired prison warden. He opined that Stokes "does not demonstrate the behaviors of being a predator" and does not demonstrate an "unusual" risk of harm in prison. J.A. 1309–14. Aiken explained that his opinion was based on the prison facility more than Stokes as an individual. Indeed, he refused to meet Stokes, or interview anyone who knew Stokes, explaining that his analysis simulated how a prison official would evaluate an inmate from their case file alone. Yet the record Aiken reviewed was apparently incomplete, and he often could not recall the details. He emphasized the prison system's punitive nature, stating that if Stokes acted out, he would be punished, including by lethal force if necessary.[2] In total, direct examination of Aiken—the entirety of the defense's case at sentencing—spans around four pages of trial transcript, while the State's cross-examination spans over 25. J.A. 1310–14; J.A. 1315–41. In closing arguments, the State emphasized that Aiken effectively agreed that Stokes may commit violence while in prison: "So it's sort of like an Alice in Wonderland thing, where he's using the punishment

---

[2] Aiken stated: "[Prison guards] have the ability, have the technique, have the training and have the equipment to effect lethal force if that person does not adequately follow certain rules and regulations," and "I have ordered inmates killed because they did not follow rules and regulations and that inmate has been killed." J.A. 1321. He said the facility could "put[] [Stokes] in a prison within a prison . . . [using] lethal force and taking his life if required." J.A. 1327.

for infractions, the ability to deal with that, to say that the man is adaptable. It's just the opposite. If it's adapting to prison, you don't have to punish him." J.A. 1365–66.

Meanwhile, the State presented robust aggravating evidence, calling 12 witnesses. Martin and the state pathologist added further details about the violence of the Snipes murder, and Faith Lapp testified about Stokes's role in the Ferguson murder. The State also presented evidence related to Stokes's prior criminal convictions. Early in his second prison stint, Stokes assaulted an inmate with a box cutter, and the State presented graphic pictures of the victim and the crime scene. Smith, Stokes's ex-wife, testified to the facts underlying Stokes's 1988 and 1991 assault convictions.

The evidence of Stokes's 1991 assault of Smith is especially relevant on appeal. Stokes's lead trial counsel, Sims, personally prosecuted that case against Stokes. In so doing, he developed and presented extensive testimony from Smith. Stokes had refused to be present in the courtroom for the 1991 trial, so he had not personally witnessed Sims's arguments and presentation. Sims never disclosed this issue to the court.[3] He later explained, "It was never asked, and I did not—it just didn't come up." J.A. 1612. It is undisputed that Sims told Stokes about his prior role; he recalled, "[W]e did discuss with Mr. Stokes, my role, who I was, and what my role had been in the previous matter with him. . . . He never expressed any desire not to have me as his attorney." J.A. 1612; *see* J.A.

---

[3] Sims did point out that his name appeared on the 1991 indictment when it was entered into evidence, requesting that it be redacted. J.A. 1426–27. However, in the brief exchange, he states that his name was on every indictment the office issued at that time; it does not appear that the request put the court on notice that Sims had personally prosecuted the case against Stokes and presented extensive testimony from Smith. *See id.*

10

1640–56. Despite his prior prosecution of the crime now being presented by the State as aggravating evidence against his client, Sims elected to personally cross-examine Smith. Indeed, the second chair, Johnson, never spoke a word on the record.

After the close of evidence, the jury deliberated for around three hours before returning a death sentence.

D.

Stokes filed an application for postconviction relief ("PCR") in October 2001, claiming ineffective assistance based on trial counsel's mitigation presentation. The court appointed PCR counsel—Keir Weyble and Robert Lominack—who filed an amended application in May 2002, adding some additional claims. PCR counsel deposed trial counsel, hired new experts, and hired a mitigation investigator.

In August 2004, PCR counsel filed another amended application, this time dropping the mitigation claim while adding an Eighth Amendment intellectual disability claim and a Sixth Amendment conflict-of-interest claim. As a result, the State initiated a formal competency assessment process that stretched on for years. Stokes was eventually found competent, and PCR counsel dropped the disability claim. They proceeded on their remaining claims, including the conflict-of-interest claim and other ineffective assistance claims but not the mitigation theory.

The PCR court denied Stokes's application in October 2010. The parties litigated issues related to the court's order into 2013. Stokes petitioned for South Carolina Supreme Court review in November 2014, which was denied in February 2016. The United States Supreme Court also denied Stokes's petition for review, and the State set an execution date.

11

Stokes then filed a petition for habeas corpus, asserting two mitigation-based ineffective assistance claims and the conflict-of-interest claim. Because the ineffectiveness claims were not exhausted in state proceedings, a federal magistrate judge held an evidentiary hearing to determine whether there was good cause for the default under *Martinez v. Ryan*, 566 U.S. 1 (2012). After hearing testimony from both sets of counsel, the magistrate recommended denying all relief. Stokes filed objections to the magistrate's report and the district court overruled them. The court adopted the report and concluded that PCR counsel were not ineffective, meaning the unexhausted mitigation-based claims were defaulted. Alternatively, the court found that trial counsel's alleged ineffectiveness was not prejudicial. Finally, the court found no actual conflict of interest, and, even if there had been a conflict, that Stokes waived any objection.

Stokes filed a timely appeal. Under 28 U.S.C. § 2253, we may consider whether Stokes is entitled to a certificate of appealability on his exhausted claims, and under *Martinez*, 566 U.S. 1, we may determine whether Stokes is entitled to appellate review of his defaulted claims. *See Owens v. Stirling*, 967 F.3d 396, 423–26 (4th Cir. 2020).

II.

In general, a state prisoner must exhaust all state court remedies before filing a 28 U.S.C. § 2254 petition. *Williams v. Stirling*, 914 F.3d 302, 311 (4th Cir. 2019). We then apply the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") standard of review, under which a petitioner is entitled to relief only if the state court adjudication of their claim was 1) "contrary to, or involved an unreasonable application of, clearly

12

established Federal law, as determined by the Supreme Court"; or 2) "based on an unreasonable determination of the facts in light of the evidence presented." *Long v. Hooks*, 972 F.3d 442, 457–58 (4th Cir. 2020) (en banc) (quoting 28 U.S.C. § 2254(d)).

Under this framework, a federal habeas court may not hear a claim that was procedurally defaulted in state proceedings unless the petitioner can show cause for the default. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Ordinarily, an attorney's error is not valid cause for such a default because "[t]here is no constitutional right to an attorney in state post-conviction proceedings." *See id.* at 752–57. Ineffective assistance claims complicate matters, however, because state law sometimes dictates that collateral post-conviction proceedings are a defendant's first opportunity to challenge their trial counsel's effectiveness. *See id.* at 755–57. That is the case here under South Carolina law. *Sigmon v. Stirling*, 956 F.3d 183, 198 (4th Cir. 2020). In *Martinez v. Ryan*, the Supreme Court adopted a narrow exception to address this gap. *See* 566 U.S. at 9. The Court held that— if state law restricts ineffective assistance claims to initial-review collateral proceedings— the ineffectiveness of a petitioner's state PCR counsel may provide cause in a federal habeas proceeding to excuse the petitioner's failure to challenge the ineffectiveness of his trial counsel. *See id.* "[B]ecause a petitioner raising a *Martinez* claim never presented the claim in state court, a federal court considers it de novo, rather than under AEDPA's deferential standard of review." *Gray v. Zook*, 806 F.3d 783, 789 (4th Cir. 2015).

Stokes argues the district court erred in concluding that his PCR counsel provided constitutionally effective representation. Therefore, Stokes argues, we may reach his underlying claim against his trial counsel. He asserts two distinct theories of trial counsel's

13

ineffectiveness: that trial counsel unreasonably failed to investigate and present personal mitigation evidence, and trial counsel unreasonably presented Aiken as their sole mitigation witness. Finally, Stokes argues the state court's conclusions as to the conflict-of-interest claim were an unreasonable application of clearly established federal law.

## III.

We first address PCR counsel's effectiveness to determine whether Stokes has shown good cause for defaulting his ineffectiveness claims. We conclude that PCR counsel's failure to develop and present a claim based on trial counsel's mitigation efforts amounts to ineffective assistance. Proceeding to the underlying claim, we conclude that trial counsel's mitigation investigation and choice not to present any personal mitigation evidence was unreasonable and prejudicial, establishing ineffectiveness. Because these conclusions alone require resentencing, we do not reach Stokes's remaining claims.

## A.

The *Martinez* exception applies when, first, the petitioner shows that "appointed counsel in the initial-review . . . was ineffective under the standards of *Strickland* [*v. Washington*, 466 U.S. 668, 687 (1984)]." *Martinez*, 566 U.S. at 14. This means that PCR counsel "performed deficiently[] under the first prong of *Strickland*, . . . but not that said counsel's deficient performance was prejudicial[] under the second prong of *Strickland*."[4]

---

[4] Asking the petitioner to show that PCR counsel's ineffectiveness prejudiced the state proceedings would effectively require the petitioner "to show that the defaulted claim is itself meritorious." *Owens*, 967 F.3d at 423 (explaining this "apparent incongruity"). Circularly, the petitioner would have to "*prevail* on the merits of [their] underlying claim (Continued)

*Owens*, 967 F.3d at 423. Second, the petitioner must show that the underlying ineffectiveness claim against trial counsel "is a substantial one," meaning that it "has some merit."[5] *Martinez*, 566 U.S. at 14.

1.

To establish ineffectiveness under *Strickland*, a petitioner must show counsel's performance was constitutionally deficient, meaning it fell below an objective standard of reasonableness. 466 U.S. at 687. Counsel's performance is evaluated based on "prevailing professional norms" at the time of the representation and in light of "all the circumstances." *Id.* at 688. Professional norms may be reflected in American Bar Association ("ABA") standards, or other comparable guides, though such guides are not dispositive of what constitutes reasonable representation in any given case. *Owens*, 967 F.3d at 412 ("[N]o fixed set of rules may 'take account of the variety of circumstances faced by defense counsel.'") (quoting *Strickland*, 466 U.S. at 688–89). Our assessment of counsel's performance is "highly deferential." *Id.* "[A] fair assessment of attorney performance

merely to excuse the procedural default and obtain consideration on the merits." *Id.* (internal quotations omitted). Therefore, we have joined our sister circuits in reading *Martinez*'s use of the phrase "the standards of *Strickland*" to refer only to performance, not prejudice. *See id.*

[5] In imposing this requirement, the Supreme Court cited the standard that governs certificates of appealability under 28 U.S.C. § 2253(c)(2). *See Martinez*, 566 U.S. at 14 (citing *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003)); *Owens*, 967 F.3d at 423. Under that standard, "a petitioner must 'sho[w] that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.'" *Miller-El*, 537 U.S. at 327 (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotations omitted)); *Owens*, 967 F.3d at 423.

requires that every effort be made to eliminate the distorting effects of hindsight . . . and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689.

Capital defense counsel have a duty to investigate and present substantial mitigating evidence, which includes the "obligation to conduct a thorough investigation of the defendant's background." *See Williams v. Taylor*, 529 U.S. 362, 391–99 (2000). The Supreme Court reaffirmed this duty several times before and during PCR counsel's representation of Stokes. *See, e.g., id.*; *Wiggins v. Smith*, 539 U.S. 510 (2003); *Rompilla v. Beard*, 545 U.S. 374 (2005); *Porter v. McCollum*, 558 U.S. 30 (2009) (per curiam); *Sears v. Upton*, 561 U.S. 945 (2010). Counsel's investigation should cover the defendant's "psychological history," which "could explain or lessen the client's culpability for the underlying offense." *See Williams v. Stirling*, 914 F.3d at 313. A reviewing court considers not only the "quantum of evidence already known to counsel," but also whether that evidence "would lead a reasonable attorney to investigate further." *Id.* (quoting *Wiggins*, 539 U.S. at 527). If counsel declined to present their findings, the inquiry focuses on "whether the investigation supporting counsel's decision . . . was itself reasonable." *Wiggins*, 539 U.S. at 523.

Here, the district court found that PCR counsel performed reasonably because they investigated Stokes's background "to some extent" and then "intentional[ly]" withdrew the mitigation claim. J.A. 3839. True, "[w]hen counsel focuses on some issues to the exclusion of others, there is a strong presumption that [they] did so for tactical reasons rather than through sheer neglect." *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003).

16

But intentionality does not guarantee reasonableness, and presumptions are rebuttable. The adequacy of counsel's investigation informs the strength of the presumption of strategy. *See Strickland*, 466 U.S. at 690–91 ("[S]trategic choices made after less than complete investigations are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."); *Wiggins*, 539 U.S. at 527–28 ("[C]ounsel were not in a position to make a reasonable strategic choice . . . because the investigation supporting their choice was unreasonable."). For example, in *Williams v. Stirling*, counsel's investigation uncovered evidence of the defendant's brain damage and his mother's alcoholism, but counsel "did not even consider whether [the defendant] had [fetal alcohol syndrome]" and "whether to pursue that evidence." 914 F.3d at 314. That counsel conducted some investigation in general was not enough; they were ineffective because they "failed to conduct *any* investigation" into a potentially mitigating condition "despite the red flags." *Id.* at 315.

Similarly, in *Wiggins*, counsel learned of the defendant's "alcoholic, absentee mother" and his "physical torment [and] sexual molestation" in foster care, but they did not pursue either discovery further. *See id.* at 523–25. "Counsel's decision not to expand their investigation" violated professional standards because they did not attempt to discover "all reasonably available mitigating evidence." *Id.* ("[A]ny reasonably competent attorney would have realized that pursuing these leads was necessary to making an informed choice among possible defenses, . . . ."). Thus, *Wiggins* rejected the "presumption" of strategy: "[T]he 'strategic decision' the state courts and respondents all invoke to justify counsel's

17

limited pursuit of mitigating evidence resembles more a *post hoc* rationalization of counsel's conduct than an accurate description of their deliberations." *Id.*

The same is true here of PCR counsel. Though they investigated "to some extent," their investigation was nevertheless inadequate because they ignored the valuable leads they uncovered. They knew about adversity in Stokes's background from trial counsel's cursory investigation. They hired their own investigator, whose additional interviews generated rich leads about Stokes's psychological, educational, and familial history. At that point, an objectively reasonable attorney would be prompted to investigate further. *See Williams v. Stirling*, 914 F.3d at 313–15 (holding "there was *necessarily* no opportunity for counsel to make a strategic decision" after counsel failed to "further explor[e]" significant "red flags"). Yet PCR counsel conducted essentially no investigation beyond the investigator's interviews. They did not re-interview any of the witnesses themselves or seek out corroborating documentary evidence. They did not speak to or request files from the social worker retained by trial counsel. While they interviewed the neurologist, who had found indicators of brain damage, they did not obtain his files or his testing results.

And, perhaps most consequentially, they did not retain an expert capable of applying their investigator's findings. Because "psychological and social history" and "emotional and mental health" are often of "vital importance" to a mitigation defense, "the defense team should include at least one person qualified to screen for mental or psychological defects." *Id.* That duty was certainly implicated in this case when the investigator found reports of Stokes's childhood experiences of physical and sexual abuse and neglect, domestic violence, and substance abuse. Without consulting an expert capable of

18

analyzing these significant "red flags," counsel did not make "efforts to discover *all reasonably available* mitigating evidence." *See Wiggins*, 539 U.S. at 524 (quoting ABA Guideline § 11.4.1(C) (1989)); *see, e.g.*, *Gray v. Branker*, 529 F.3d 220, 229–32 (4th Cir. 2008) (holding counsel ineffective where they "simply missed or ignored—and failed to act on—the many signs that [the defendant] was mentally and emotionally unstable" and failed to "explor[e] the need for mental health testimony from an expert"); *Hamilton v. Ayers*, 583 F.3d 1100, 1114–17 (9th Cir. 2009) (finding ineffectiveness where indicators of mental illness meant that counsel "should have retained a mental health expert and provided the expert with the information needed to form an accurate profile of [the defendant's] mental health").

PCR counsel themselves testified that this error explained their unreasoned approach to the mitigation issues. When asked whether they "consult[ed] an expert to assess [the] rather wealth of mitigation information," Weyble responded, "No, we didn't." J.A. 2718. And when asked "Did you have a strategic reason for failing to do that?" he said, "No." *Id.* Similarly, Lominack testified, "We did not hire a social worker. And I do not think that I worked on a case before or since . . . in which I did not hire a social worker." J.A. 2998 ("I absolutely need someone who has the knowledge and the expertise to take this evidence and characterize it and put it in the right boxes."); *see also* J.A. 3377 ("[W]e stopped short of putting [the findings] in front of people who could help us understand it and generate that plausible explanation for behaviors."). He explained that this error was due to a lack of experience, as opposed to strategy:

19

> I look back at the cases I handled early in my career with some degree of embarrassment. I think the most specific example is ever working on a case without a social worker. I can't imagine doing that at the end of my career. And when I encountered that in other cases, it was shocking because it's not the standard of care and wasn't when I worked on this case.

J.A. 2621. And while it is true that a decision not to investigate may itself be strategic—for example, if the findings would be more harmful than helpful, *see Wiggins*, 539 U.S. at 525 (collecting cases)—there is no evidence that informed PCR counsel's decisions here.

Instead, PCR counsel cited non-strategic reasons for their investigatory decisions and abandonment of the claim. *See, e.g.* J.A. 2983–85 (explaining that the failure to "personally interview[] any of those [mitigation witnesses]" was either "lazy or not knowing that should have been done or not knowing I should have done it."); J.A. 3018 ("We didn't have a social worker. . . . I don't think we had enough information at the time to decide that it was a claim that needed to be thrown out, and I don't think that's what we did, certainly not with any intentionality."); J.A. 3031 ("We weren't thoughtful enough to have personally interviewed any of the people that were relevant to the claim that we dropped."). Because PCR counsel's investigation fell short of professional standards, it cannot support the presumption that their subsequent abandonment of the claim was strategic. *See Wiggins*, 539 U.S. at 527–28, 536 ("[C]ounsel chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible."); *Williams v. Stirling*, 914 F.3d at 316–17 ("[T]he PCR court relied on the factual assumption that trial counsel made a strategic choice not to present" mitigation evidence, but "it was impossible for trial counsel to have made a strategic choice because there was no investigation into" that issue).

20

Beyond the investigation's shortcomings, PCR counsel's testimony directly rebuts the presumption that they dropped the mitigation claim strategically. PCR counsel testified that they neglected the mitigation theory after becoming preoccupied with other claims. When asked if he recalled "why [he] would have omitted that claim," Weyble explained: "At that same time, what was then called mental retardation [and] is now called intellectual disability claim arose, somewhat to our surprise, frankly. And I think we became somewhat distracted by the shiny object, if you will, and thought we—that we were really on to something there." J.A. 3259. Likewise, when asked "why did [he] withdraw the mitigation claim," Lominack responded:

> [W]e were so focused at the time on the intellectual disability claim, . . . somewhat to the detriment of . . . [a] mitigation claim. I don't recall having a specific reason why we would abandon a general mitigation claim, especially when at trial nothing was presented, which is quite rare, actually, for there not to be any mitigation presented about a client's childhood. I don't recall in Mr. Stokes's case, and frankly, in any case, how I could have thought that that was going to be a wise or reasonable choice, and the only thought that I have now is that we were so focused on the I.D. claim that we dropped it and focused on that instead.

J.A. 2918. This testimony does not describe strategic prioritization among multiple claims. Rather, counsel testified that their prioritization of other claims was uninformed and happenstance, the product of distraction, inexperience, and carelessness. *See, e.g.*, J.A. 3018 ("I'd love to, in hindsight, say, yeah, we knew what we were doing. We didn't. We were focusing on the [disability], adaptability, and IQ investigation."); J.A. 3031 ("I think one of the reasons I'm not remembering a real strategic reason . . . is that, to be blunt, I'm not sure that we were that thoughtful about it."); *cf. Wood v. Allen*, 558 U.S. 290, 309 (2010) (Stevens, J., dissenting) (distinguishing a decision that is "the product of a deliberate

21

choice between two permissible alternatives" from one that is "the product of inattention and neglect by attorneys preoccupied with other concerns").

Also, Stokes was ultimately found competent years later, and PCR counsel dropped the disability claim that had been hogging their attention. PCR counsel did not testify to any strategic basis for declining to pursue the mitigation theory at that point. *See, e.g.*, J.A. 2993 ("[T]o me, it's nonsensical to be so hyper-focused [on intellectual disability], . . . especially when th[at claim] went by the wayside after the [state] evaluation."); J.A. 3262 (responding, after being asked why they did not revive the mitigation claim after the intellectual disability claim failed, "I don't have a good answer to that question").[6] Nothing suggests that counsel was strategically winnowing the claims, selecting only those few deemed most meritorious: In their original petition, PCR counsel raised six claims in

---

[6] The district court largely ignored PCR counsel's testimony. It relied on one exchange from Weyble's cross-examination, where Weyble responded "yes" to the prosecutor's statement that "there had to be a reason that [he] withdrew [the claim]" because if he "thought it was a strong claim," he would have presented it. *See* J.A. 3840–41. The court discredited the countervailing portions of PCR counsel's testimony as "fall[ing] on their sword for their former client." J.A. 3840. But nothing in the record justifies selectively crediting this exchange while disregarding extensive contrary evidence from the same witnesses. An evidentiary ruling may not rest solely on the court's presumption of the witness's sympathies and intentions. For example, the dissent the district court cited as its sole authority called out perceived "sword falling" in a footnote, but it supported that charge by arguing the witness's testimony about "the particulars of his investigation" contradicted his "self-denigrating" characterizations. *Dugas v. Coplan*, 428 F.3d 317, 346 n.39 (1st Cir. 2005) (Howard, J., dissenting). Here, the district court pointed to no factual contradictions in Weyble and Lominack's testimony that undermined their generally negative portrayal of their performance. They gave reasonable explanations for why they made decisions they now believed to be improper, such as a lack of experience or being distracted by new developments. The district court did not identify, nor do we find, anything in the record making PCR counsel any less credible than trial counsel, whose testimony the district court relied on extensively.

22

addition to the intellectual disability claim, three of which were so weak that they later abandoned them and two of which, alleging ineffective assistance of appellate counsel, had obvious and dispositive weaknesses.[7]  Considering the dramatic lack of mitigation evidence presented at trial despite Stokes's background, PCR counsel's failure to consider adding the mitigation claim back into the petition is further evidence of unreasonableness, not strategy.  *See McKee v. United States*, 167 F.3d 103, 106 (2d Cir. 1999) ("A petitioner may rebut the suggestion that the challenged conduct reflected merely a [tactical] choice . . . by showing that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker.").  Here, like in *Wiggins*, the purportedly strategic decision "resembles more a *post hoc* rationalization of counsel's conduct than an accurate description of their deliberations."  *See* 539 U.S. at 523–25.

Absent strategic justifications, PCR counsel's abandonment of the mitigation claim was objectively unreasonable.  PCR counsel knew that trial counsel's investigation was paltry.  Further, trial counsel presented no background mitigation evidence at all, and the Supreme Court had recently deemed trial counsel ineffective for even more robust presentations.  *See, e.g.*, *Williams v. Taylor*, 529 U.S. at 368, 395 (finding mitigation presentation ineffective, despite testimony from the defendant's "mother, two neighbors,

---

[7] As the PCR court explained, the two claims alleging ineffective assistance by appellate counsel were without merit because they improperly faulted appellate counsel for failing to argue points that had not been preserved at trial.  Additionally, the PCR court noted that one of the claims—that appellate counsel should have argued that the trial court erred by failing to instruct on a mitigating factor for the victim's participation or consent in the act—was "groundless" in any event, because "Snipes did not consent to the violence that was about to strike her."  J.A. 1775–76 n.6.

and . . . a psychiatrist," because counsel failed to relay "[the defendant's] nightmarish childhood"); *Porter*, 558 U.S. at 32, (finding ineffectiveness, despite testimony about the defendant's relationship with his son, because counsel "failed to . . . present any evidence of [the defendant's] mental health . . ., his family background, or his military service").

PCR counsel's own failure to pursue and present a mitigation-based claim arising from trial counsel's performance constitutes ineffective assistance. *See, e.g.*, *Blake v. Baker*, 745 F.3d 977, 982–83 (9th Cir. 2014) (finding PCR counsel ineffective where counsel did nothing with witness statements describing "the abhorrent conditions of [the petitioner's] upbringing and family history" and "failed to . . . retain experts" to review the findings); *Trevino v. Davis*, 829 F.3d 328, 348–49 (5th Cir. 2016) (holding that PCR counsel were ineffective in failing to pursue a mitigation claim where trial counsel "presented only one mitigation witness and no other evidence," and "[t]he deficiency in that investigation would have been evident to any reasonably competent habeas attorney").

### 2.

Given the extraordinary facts of this case, Stokes's underlying ineffectiveness claim against his trial counsel is "substantial" for *Martinez* purposes. *See* 566 U.S. at 14. The basis for questioning trial counsel's effectiveness is plain enough that PCR counsel's failure to adequately pursue it was objectively unreasonable. It follows that the underlying claim has "some merit"—meaning, at the very least, reasonable jurists could debate its

24

viability.[8]  *See id.*; *Miller-El*, 537 U.S. at 327.  Therefore, under *Martinez*, Stokes has established cause for procedurally defaulting his mitigation-based ineffective assistance claim against trial counsel in state proceedings.  Accordingly, we proceed to the merits.

B.

To establish trial counsel's ineffectiveness, the petitioner must show that 1) their performance fell below an objective standard of reasonableness, and 2) the deficient performance was prejudicial.  *See Strickland*, 466 U.S. at 687.  To establish prejudice, the petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *See id.* at 694.

1.

Trial counsel were constitutionally deficient for much the same reasons as PCR counsel.  Their investigation was inadequate, and their decision to withhold all personal mitigation evidence was unreasonable.

Trial counsel had little-to-no experience preparing a mitigation defense, yet they consulted with no experienced attorneys or mitigation experts.  Their mitigation efforts, totaling around 45 hours, began six months into their nine-month representation, though the ABA Guidelines stated that sentencing investigation should "begin immediately upon

---

[8] The district court also found, alternatively, that Stokes could not show prejudice from trial counsel's alleged ineffectiveness, and therefore "his underlying claim . . . is not substantial."  J.A. 3849 (citing *Martinez*, 566 U.S. at 14).  Though inconsequential, this was an improper application of *Martinez*'s substantiality requirement.  A claim that fails on the merits may very well still be "substantial" for purposes of showing cause for a procedural default.  *See Owens*, 967 F.3d at 423.  The question is whether the claim has "some merit," meaning that reasonable jurists could at least debate its viability.  *See Martinez*, 566 U.S. at 14 (citing *Miller-El*, 537 U.S. at 327); *Owens*, 967 F.3d at 423.

counsel's entry into the case and should be pursued expeditiously." ABA Guidelines § 11.4.1 (1989). They hired an inexperienced mitigation investigator who was still conducting interviews through the guilt phase of the trial. They did not personally conduct any follow-up interviews or otherwise develop the investigator's findings. They retained experts to testify at sentencing, but those experts were apparently not consulted about the personal mitigation evidence. In a capital murder trial where mitigating the death penalty was the central issue in the defense, such an investigation is objectively unreasonable.[9] *See Wiggins*, 539 U.S. at 523–25 ("Despite these well-defined norms, . . . counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources."); *see also Earp v. Ornoski*, 431 F.3d 1158, 1175–76 (9th Cir. 2005) ("*Wiggins* . . . establishes that the presence of certain elements in a capital defendant's background, such as a family history of alcoholism, abuse, and emotional problems, triggers a duty to conduct further inquiry before choosing to cease investigating.").

---

[9] Trial counsel did conduct *some* investigation. Their investigator subpoenaed records and interviewed several friends and family members, going beyond some investigations that have been deemed unreasonable. *See, e.g.*, *Wiggins*, 539 U.S. at 523–24 (counsel only obtained the presentence report and one set of social services records); *Porter*, 558 U.S. at 39 (counsel obtained no records and conducted no interviews of the defendant's family). Nevertheless, trial counsel unreasonably failed to pursue the indications of extreme childhood trauma, neglect, and abuse. *See Gray v. Branker*, 529 F.3d at 229–32 (finding unreasonableness, even where counsel interviewed "friends and associates" and retained experts, because they "failed to investigate for mental health evidence"); *Williams v. Stirling*, 914 F.3d at 313–16 (faulting counsel for ignoring "red flags," though their investigation otherwise "*did* bear the hallmarks of effective assistance").

Trial counsel's subsequent decision to withhold the personal mitigation evidence they did have was also objectively unreasonable. At the outset of sentencing, members of Stokes's family and a social worker were prepared to testify. A neurologist and psychiatrist were prepared to testify about Stokes's HIV status, but presumably could have offered other personal testimony about Stokes instead. Yet counsel abandoned this evidence based on their impressions of the jury, deciding the jurors—the Black jurors in particular—would react negatively to evidence of Stokes's life story after hearing the prosecution's aggravating case. As Johnson put it:

> [H]ow do you go to a jury and say, look, we want you to look at the fact that he had a poor upbringing, particularly African-American, which a lot of us had struggles coming up, how do you say, well, just because he had a poor upbringing, you need to overlook the fact that he raped this woman, you need to overlook the fact that he cut her vagina out, you need to overlook the fact that he cut her nipples off, you need to overlook the fact that he killed somebody else.

J.A. 3424–25.

This concern reflects a misunderstanding of the duty to mitigate. Trial counsel were not obliged to ask the jury to excuse Stokes's actions. Instead, their duty was to mitigate Stokes's "moral culpability." *See, e.g.*, *Williams v. Taylor*, 529 U.S. at 398 (explaining that "the graphic description of [the defendant's] childhood, filled with abuse and privation, . . . might well have influenced the jury's appraisal of his moral culpability" by showing that his violence was "compulsive" as opposed to "cold-blooded premeditation"); *Caro v. Woodford*, 280 F.3d 1247, 1258 (9th Cir. 2002) ("By explaining that [the defendant's] behavior was physically compelled, . . . or even due to a lack of emotional control, his moral culpability would have been reduced."). Counsel can carry out this duty without

27

diminishing the defendant's responsibility for their actions or the seriousness of their crimes. *See Eddings v. Oklahoma*, 455 U.S. 104, 115–16 (1982) (qualifying, after explaining why youth mitigates moral culpability, that "[a]ll of this does not suggest an absence of responsibility for the crime of murder, deliberately committed in this case"). As one mitigation specialist has put it:

> Mitigation is *not* a defense to prosecution. It is not an excuse for the crime. It is not a reason the client should "get away with it." Instead, mitigation is a means of introducing evidence of a disability or condition which inspires compassion, but which offers neither justification nor excuse for the capital crime. . . . It explains the influences that converged in the years, days, hours, minutes, and seconds leading up to the capital crime, and how information was processed in a damaged brain. It is a basis for compassion—not an excuse.

Russell Stetler, *The Mystery of Mitigation*, 11 U. Pa. J. L. & Soc. Change 237, 261 (2008). Thus, trial counsel did not have to ask the jury to "overlook" the graphic details of the prosecution's case. Instead, their personal evidence could have provided humanizing context, allowing the jury to reach a more sympathetic understanding of the individual behind the aggravating evidence. *See Allen v. Woodford*, 395 F.3d 979, 1000 (9th Cir. 2005) ("[Using] mitigation evidence to complete, deepen, or contextualize the picture of the defendant presented by the prosecution can be crucial to persuading jurors that the life of a capital defendant is worth saving.").

But because trial counsel had no experience or formal training in mitigation, conducted a shallow investigation, and failed to consult with experts, they underestimated the value of their evidence. Stokes's life story contains far more than a merely "difficult upbringing" and "struggles coming up"; the evidence shows profound and chronic trauma

28

that was about as extreme as any child can experience. Such evidence is prototypical for a personal mitigation narrative. *Wiggins*, 539 U.S. at 535 (referring to "severe privation and abuse in the first six years of [the defendant's] life" as "the kind of troubled history we have declared relevant to assessing a defendant's moral culpability"); *Hooks v. Workman*, 689 F.3d 1148, 1203–04 (10th Cir. 2012) ("[E]ven the most minimal investigation would have uncovered a life story worth telling, . . . [which is] exactly the sort of evidence that garners the most sympathy from jurors."). If trial counsel believed the jury would not have responded well to a presentation that minimized Stokes's conduct, their duty was to find a way to convey this highly significant evidence without doing so.

That is especially true when considered against their alternative decision: to offer almost no mitigation presentation at all. Having declined to present their personal mitigation evidence, trial counsel put forward one witness, the former prison warden, who never met Stokes and was repeatedly unfamiliar with the details of Stokes's records. Trial counsel's direct examination produced about four pages of trial transcript, the entirety of their sentencing presentation. *Cf. Wiggins*, 539 U.S. at 526–27 (describing counsel's presentation, which failed to provide details of the defendant's history, but did provide one expert's testimony about prison adaptability, a "halfhearted mitigation case" taking a "shotgun approach"). Meanwhile, as anticipated, the government put forward 12 witnesses detailing Stokes's violence in the Snipes murder and in previous incidents. Thus, the only evidence the jury heard about Stokes detailed his crimes and violence, distorting the jury's perception of "the uniqueness of the individual" facing execution. *See Lockett v. Ohio*, 438 U.S. 586, 604–05 (1978); *see, e.g.*, *Ferrell v. Hall*, 640 F.3d 1199, 1234, 1236 (11th

Cir. 2011) (concluding that, because "the jury heard absolutely nothing about the substantial mitigating evidence," including childhood abuse, "[t]he jury labored under a profoundly misleading picture of [the defendant's] moral culpability").

The basis for trial counsel's decision—that a South Carolina jury in the 1990s, and particularly Black people, would not be open to a personal mitigation narrative—was objectively unreasonable.  In 1989, ten years before Stokes's trial, the Supreme Court referred to "the belief, *long held by this society*, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse."  *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (emphasis added) (quoting *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring)), *overruled on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002).  Even earlier, in 1976, the Court explained:  "A process that accords no significance to relevant facets of the character and record of the individual offender . . . excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind." *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976).  There is no reason to believe that South Carolinians in 1999—no matter their race—would have been indifferent to the "frailties of humankind" and these bedrock principles of mercy and morality.

Therefore, even when giving appropriate deference to trial counsel's strategic judgment, trial counsel's failure to investigate and present personal mitigation evidence was objectively unreasonable under professional standards at the time of the representation.

2.

As to prejudice, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 694–95. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Because the sentencer in this case was a unanimous jury, prejudice "requires only 'a reasonable probability that at least one juror would have struck a different balance'" when appraising Stokes's moral culpability and deciding on death. *See Andrus v. Texas*, 140 S. Ct. 1875, 1886 (2020) (quoting *Wiggins*, 539 U.S. at 537). To determine whether the petitioner has made that showing, "the reviewing court must consider 'the totality of the available mitigation evidence,'" both at trial and from postconviction proceedings, "and 'reweig[h] it against the evidence in aggravation.'" *Id.* (quoting *Williams v. Taylor*, 529 U.S. at 397–98).

The district court summarized the evidence of Stokes's life story in a sentence, referring to the death of his parents, his "abusive[] and neglectful" childhood, and "that he struggled in school with no intervention." J.A. 3843. It also considered the report of Stokes's new expert, who concluded that these "aspects of [Stokes's] background" likely impacted his adult behavior. J.A. 3843–44. The court then summarized the State's case in aggravation and concluded that Stokes failed to establish prejudice because the aggravating evidence "was overwhelming." J.A. 3844–48. The court especially emphasized the "horrific circumstances" of the Snipes and Ferguson murders, noting that an additional

31

murder is recognized as "the most powerful imaginable aggravating evidence."[10]  *Id.* (citing *Wong v. Belmontes*, 558 U.S. 1, 27–28 (2009); *Morva v. Zook*, 821 F.3d 517, 532 (4th Cir. 2016)).  Thus, the court concluded that "all the mitigating evidence does not outweigh all the aggravating evidence presented at trial," and so Stokes did not show "a reasonable probability that at least one juror would have voted against the death penalty had it heard the additional mitigating evidence in question."  J.A. 3848–49.

We disagree.  While there is no doubt that the State's aggravation case was extensive, the analysis is not as simple as comparing two piles of evidence and asking which is greater.  The addition of just some meaningful mitigating evidence could be enough to sway one juror against death, even in the face of plentiful aggravating evidence.  *See, e.g.*, *Williams v. Taylor*, 529 U.S. at 398 ("Mitigating evidence . . . may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case.").  And when a jury heard virtually no mitigation evidence at trial, and nothing about the defendant as an individual, the unheard personal evidence is especially impactful on the prejudice calculus.  *See Porter*, 558 U.S. at 41–44.

---

[10] In emphasizing these aspects of the Snipes murder, and the commission of the Ferguson murder, the district court considered evidence going to the aggravating factors that the jury did not find.  The jury found the evidence established:  1) criminal sexual conduct; 2) kidnapping; 3) murder for the purpose of receiving money; and 4) that the defendant caused another person to participate.  But the jury did not find that the State established:  1) physical torture; or 2) that two or more persons were murdered by the defendant.  While there were surely other "horrific" elements of the Snipes murder that the court may have been referring to, the court should not have given weight to Stokes's alleged torture of Snipes or his role in the Ferguson murder.  *Cf. Porter v. McCollum*, 558 U.S. 30, 41–42 (2009) (explaining that "the weight of evidence in aggravation" was "not as substantial as the sentencing judge thought" where one of two aggravating factors was reversed on appeal).

32

In *Porter*, the jury "heard almost nothing that would humanize [the defendant] or allow them to accurately gauge his moral culpability." 558 U.S. at 41–44. The jury could have heard about the defendant's PTSD from military service, a "childhood history of physical abuse," and a "brain abnormality" that caused learning disabilities. *Id.* "Instead, they heard absolutely none of that evidence, evidence which 'might well have influenced the jury's appraisal of [the defendant's] moral culpability.'" *Id.* (quoting *Williams v. Taylor*, 529 U.S. at 398). Some negative facts in the mitigation evidence were not enough to undermine its impact because the negative aspects were still "consistent with th[e] theory of mitigation and d[id] not impeach or diminish the evidence." *Id.* The Court found the prejudice requirement satisfied, especially because "[w]e do not require a defendant to show 'that counsel's deficient conduct more likely than not altered the outcome, . . . but rather that he establish 'a probability sufficient to undermine confidence in [that] outcome.'" *Id.* at 44 (quoting *Strickland*, 466 U.S. at 693–94).

The same reasoning applies here. The unheard mitigation evidence would have shown Stokes experienced an "extraordinarily high" degree of childhood adversity, likely surpassing 99.9% of the population. J.A. 2181–82; *see generally* J.A. 2173–2201. And, through expert evidence, the defense could have explained the likely consequences of such a childhood, connecting "chronic trauma" to brain development and adult behavior. Instead, by presenting no personal evidence at all, counsel failed to "explain to the jury why [Stokes] may have acted as he did . . . connect[ing] the dots between, on the one hand, [his] mental problems, life circumstances, and personal history and, on the other, his commission of the crime in question." *See Hooks v. Workman*, 689 F.3d at 1204. As a

33

result, "jurors faced with an especially brutal crime were left with almost nothing to weigh in the balance." *See id*.

Thus, the prejudice analysis turns on the likely influence of dramatic mitigation evidence on a jury that heard dramatically little about the defendant. In that context, the weight of the unpresented mitigation evidence is significantly increased, enough to outweigh even the upsetting and extensive aggravating evidence. *See, e.g.*, *Williams v. Taylor*, 539 U.S. at 537 (finding prejudice in failure to present personal evidence even where the petitioner "had savagely beaten an elderly woman, stolen two cars, set fire to a home, stabbed a man during a robbery, and confessed to choking two inmates and breaking a fellow prisoner's jaw"); *see also Smith v. Stewart*, 189 F.3d 1004, 1013–14 (9th Cir. 1999) (explaining that "[t]he horrific nature of the crimes . . . does not cause us to find an absence of prejudice," especially "where the presentation of mitigating evidence was wholly inadequate"). If the jury could have placed Stokes's "excruciating life history on the mitigating side of the scale," then "there is a reasonable probability that at least one juror would have struck a different balance." *See Wiggins*, 539 U.S. at 537; *Porter*, 558 U.S. at 42. Simply put, "there exists too much mitigating evidence that was not presented to now be ignored." *Porter*, 558 U.S. at 44 (quoting *Porter v. Florida*, 788 So.2d 917, 937 (Fla. 2001) (Anstead, J., concurring in part and dissenting in part)).

The district court failed to consider that trial counsel's decisions meant they presented almost no mitigating evidence. It cited cases where additional personal evidence was insufficient to show prejudice after a jury heard a significant quantity of such evidence at trial. *See Wong*, 558 U.S. at 20–21 (noting that "the mitigating evidence [the defendant]

34

did present" at sentencing "was substantial," including nine witnesses who "highlighted [his] terrible childhood"); *Morva*, 821 F.3d at 522–23 (listing mitigation efforts including two court-appointed mental health experts, a specialist investigator, and thirteen witnesses). The hypothetical impact of Stokes's life story and expert evidence on a jury that heard nothing about Stokes at all is quite distinct from the impact of a few more witnesses on a jury that heard an already-robust mitigation presentation. *Cf. Wong*, 558 U.S. at 22 (finding that the proposed evidence "was merely cumulative of the humanizing evidence [the defendant] actually presented" and "would have offered an insignificant benefit"); *Morva*, 821 F.3d at 522–23, 529 (stating that counsel interviewed "many" family members, and several testified or submitted affidavits, but the defendant "complains that counsel could have interviewed other[s]").

In sum, trial counsel's unreasonable mitigation efforts prejudiced Stokes. Given Stokes's immediate confession, his defense turned almost exclusively on mitigation from its very outset. Yet trial counsel spent too little time on their investigation and failed to appreciate their findings. Then, despite the wealth of reasonably available, highly compelling mitigation evidence, counsel told the jury effectively nothing about Stokes as an individual. Had the jury heard the unpresented evidence, the probability that at least one juror would have voted against death is great enough to undermine our confidence in the outcome. *See Porter*, 558 U.S. at 44; *Andrus*, 140 S. Ct. at 1886.

We conclude that Stokes has satisfied both the deficient performance and prejudice prongs of *Strickland* on his mitigation-based claim, establishing that he received ineffective

35

assistance of counsel at sentencing. Because this conclusion alone requires resentencing, we do not reach the remaining claims.

## IV.

For the foregoing reasons, we reverse the judgment of the district court and remand with instructions that the district court issue the writ of habeas corpus unless the State of South Carolina grants Stokes a new sentencing hearing within a reasonable time.

*REVERSED AND REMANDED*

QUATTLEBAUM, Circuit Judge, dissenting:

When considering the important skills of a trial attorney, those that might first come to mind are the skills we see in action—opening statements, examining witnesses and closing arguments. But as important as those skills are, just as important is a skill we don't see—strategic decision-making. A lawyer must make many decisions before and during the course of a trial. And what often makes those decisions so difficult is that many cut both ways. The decision to advance an argument, introduce certain evidence, call a witness, cross-examine a witness aggressively or lightly and so many other decisions can be—and often are—double-edged swords. There are pros and cons each way.

Evaluating these decisions, a lawyer must consider a litany of questions. How much benefit can be gained? How much harm can be caused? Can the harm be mitigated? Is the benefit that can be gained worth the harm that can result? And so on.

Oftentimes, the answers to these questions are not obvious. In fact, answering them is more a matter of art than science because intangible factors come into play. A lawyer must rely on experience, intuition and even gut instinct.

Making things even harder, trials are fluid. What might have made sense before trial may become a bad idea based on events that transpire during trial. To address that fluidity, a lawyer must constantly consider how the trial is progressing, and how the judge and jury are responding to the evidence and arguments.

In these difficult decisions, different lawyers can, and do, come to different conclusions. For some issues, you could ask ten lawyers and often get ten different decisions. Nevertheless, decisions must be made.

In this appeal, we review the decisions made by lawyers in the weightiest of circumstances—the defense of a capital defendant. Although the decisions were quintessentially strategic and informed by a thorough investigation, the majority determines that they amounted to ineffective assistance of counsel. I disagree. These decisions, according to our precedent, merit our highest deference. In my view, the record does not come close to overcoming that required deference. Accordingly, I dissent.

## I.

Over twenty years ago, Thomas Sims and Virgin Johnson's client, Sammie Stokes, was charged with the gruesome murder of Connie Snipes. The State sought the death penalty. The evidence against Stokes was overwhelming and horrific. Stokes even confessed to the murder. Because Sims and Johnson suspected Stokes would be convicted, they developed a strategy they felt would be most effective during the probable sentencing phase of the case. They wanted to emphasize Stokes' remorse and highlight the conduct and motivation of Norris Martin, who participated in the murder with Stokes, with the hope that the jury would view him as "the bad guy." J.A. 1543.

Trial counsel also planned to focus on the fact that Stokes had AIDS. Counsel planned for experts, including a forensic psychiatrist, to talk about Stokes' mental health and related medical issues. Sims and Johnson felt the best way to move the jury to spare Stokes' life would be to point out how AIDS would debilitate Stokes and given the knowledge about that disease at the time, that AIDS effectively was its own death sentence.

But trial counsel's preparation did not stop there. Sims and Johnson also investigated mitigating evidence. They hired a mitigation investigator and interviewed witnesses including Stokes' family and friends. From that work, trial counsel learned that Stokes' childhood included significant trauma and abuse which might be useful in providing some context for Stokes' conduct.

For example, the trial defense team's interview with Stokes' sister revealed that Stokes' parents, who did not live together, both drank excessively. After their father died, Stokes' mother remarried. The stepfather also drank a lot but was violent as well. Stokes' sister reported that he abused their mother. Stokes' sister told the team that she and Stokes had to fight their stepfather to keep him from beating their mother.

Other family members revealed similar information to the trial team. A cousin told the trial team Stokes' mother was "a drinker, fighter and was wild" and that her children "grew to be the same." J.A. 2535. Another relative told the team that Stokes' mother and stepfather "liked to drink, party, go to clubs and often took [Stokes and his sister]." J.A. 2536. She added that Stokes' mother and stepfather both assaulted each other.

In addition to uncovering this evidence through their mitigation investigator, trial counsel assembled experts to testify about the mitigation evidence if they decided to use it. They engaged and worked with a forensic psychiatrist, a jury consultant and an expert in social work.

But Sims and Johnson's investigation revealed risks of utilizing this mitigation evidence. The witnesses who would, if asked, be able to provide mitigating evidence, also had information that was damaging to their strategy of portraying Martin as the main

39

culprit. Stokes' sister, during the trial team's interview of her, described Stokes as "very moody" and that his personality would "flip." J.A. 2529. She also talked about Stokes' relationship with Martin. She said Stokes frequently made Martin, who had been his friend since childhood, "hustle for him." J.A. 2529. And Stokes was violent toward Martin if he was not successful in those activities. More specifically, Stokes "beat [Martin] up when he did not get his money on time." J.A. 2529. Stokes' sister told the trial team that Martin was "very afraid of [Stokes]." J.A. 2529.

An ex-girlfriend provided additional information that Sims and Johnson had to consider. She told the team that they dated when she was fifteen but broke up after she became pregnant with Stokes' child. She said Stokes never supported the child in any way. She also revealed that it was rumored that Stokes was a bisexual and sexually abused Martin in the past.

With knowledge of the background of Stokes' relationship with Martin from these interviews and of the fact that there was even "some question as to whether or not there was even a homosexual relationship between [Stokes and Martin]," trial counsel "didn't want it to come out that [Stokes] had, you know, used him and had him doing everything . . . ." J.A. 1537.

Trial counsel's predictions about guilt proved to be correct. An Orangeburg County, South Carolina jury found Stokes guilty of murder, kidnapping, first degree criminal sexual conduct and criminal conspiracy arising from the murder of Connie Snipes. J.A. 990–91. That set the stage for the penalty phase where the jury would determine whether Stokes would be sentenced to death or life in prison. J.A. 1013. South Carolina sought to prove

several statutory aggravating circumstances in seeking the death penalty. With Stokes' life on the line, Sims and Johnson had to decide whether any statutory mitigating circumstances or other evidence might help save his life. J.A. 997–98.

Complicating their decision-making, about five days before trial, Stokes developed cold feet about introducing information about his AIDS prognosis to the jury. Even so, he decided that theme could only be pursued if certain people, particularly family and friends, were removed from the courtroom. J.A. 2544. And that was the plan—to clear the courtroom prior to offering the evidence. J.A. 1548–49, 3480.

Then Stokes changed his mind. As the sentencing phase began, "[j]ust as [they] got ready to start presenting that evidence, [Stokes] then said, no, I don't want it coming in," forcing the court into a recess as the defense team tried to persuade Stokes to allow the prepared defense to go forward. J.A. 1546. At the eleventh hour, Stokes decided he did not want his children and family, and the jury for that matter, to hear he had AIDS. While that was his choice, it substantially gutted his mitigation defense.

Based on this, Sims and Johnson had to adapt and decide what to do instead. Presenting mitigating evidence about Stokes' traumatic and abuse-ridden childhood was an option. The benefit of that mitigating evidence was that it might give jurors some understanding of how and why Stokes came to the point of committing the horrific events the jury had just learned about. If jurors understood how such an upbringing could cause real psychological harm and lead to a propensity toward violence, they might be willing to spare Stokes' life. Sims and Johnson had gathered this evidence. The witnesses were available.

But they also knew that many of the witnesses who would testify about Stokes' childhood and background in a manner that provided some explanation or context for Stokes' criminal conduct—like Stokes' sister and aunt—also knew about Stokes' temperament and his relationship with Martin. They knew that along with the potential mitigating evidence, there was damaging information that would likely come out on cross-examination, information that would be harmful to Stokes' defense.

And they also felt the mitigating evidence might not, in this context, be helpful at all. They felt the jury might perceive the evidence not as mitigating evidence, but as an attempt to avoid responsibility for the crime. So, after considering the issue, they decided not to introduce it. Sims described how they came to that decision:

> Q. So did -- ultimately, did Sara Stokes, Ruth Davis, or Dr. Rodgers testify on Mr. Stokes' behalf at sentencing?
> A. No, they didn't.
> Q. And why was that?
> A. We made a strategic decision -- after having the opportunity to get together, we made a strategic decision that certain -- that mitigation kind of evidence that was the ongoing way that things were done at that time was not going to work in Orangeburg County.
>    Having had the opportunity to look at the jury, having had the opportunity to see how they reacted to a number of things that were going on in the courtroom, we made a decision that we were going to take another avenue in order to try to save his life.

J.A. 3469. He continued:

> Q. Okay. At the -- what made you decide that the jury would not be receptive to that testimony?
> A. In trial work, and having been in trial work for a period of time up to that time -- this is going on my 40th year of being a trial lawyer -- you get the opportunity to look at the jury, you see their reaction to what is happening in the courtroom, you look at those who are leaning forward at certain times to certain testimony, you look at those who are leaning back and closing their arms at certain testimony, you try to look to see if anybody's shaking their

42

head with where you want to go, and you try to -- and during the trial you look at things that are developing.

I always say that a trial has a life of its own. You may start out with a theory and a process that you want to go through, but in the middle of the trial, as it begins to progress, you may have to change the way that you are actually going to go, and that's what happened in this case.

And take into consideration also you're in Orangeburg County and there were things that, back in '97, '98, '99 when this was going on, that we have to take into consideration too. When you -- the way I looked at it, and I believe Mr. Johnson will verify this also, when we looked at it and we talked about the kind of crime that had been committed, we talked about some of the things that had happened to the young lady who was killed, how her body was mutilated, and those kind of things in Orangeburg County, we have to take that into consideration too.

Q. Can you help me understand what about the jury made you think that the type of evidence that you had intended to introduce originally through Sara Stokes, Ruth Davis, Dr. Rodgers, would not be persuasive to them?

A. I would have looked at that jury, I would have looked at the composition of the jury, probably during the trial would have gone home and reviewed the jurors' background information again to determine the best way that you could probably get that juror on your side. I would have -- would have -- there were African-Americans and there were white people on the jury too.

Looking at that, taking it into consideration as a whole and how the trial had been going and what was being brought out, the question at that point is whether or not putting out the background of the individual and the kind of life that they had had as a child would be effective in light of the facts of the case and the people that you had on the jury.

J.A. 3470–3472.

Johnson also testified about their decision:

Q. So in terms of deciding how to or whether to investigate [Stokes'] childhood and background, did the aggravated nature of the case affect how you approached that?

A. It didn't affect how I approached it, but it sure enough affected how we presented it.

Q. In what way?

A. When you had to present it -- in your presentation at trial, you had to try to find a way to present it, if you had to present it, in the preparation. If you had to present it, you had to try to find a way to present it where it didn't seem so offensive, yet you can't play it down. It's just a fine balance, because how do you -- how do you tell somebody, how do you go to a jury and say,

43

look, we want you to look at the fact that he had a poor upbringing, particularly African-American, which a lot of us had struggles coming up, how do you say, well, just because he had a poor upbringing, you need to overlook the fact that he raped this woman, you need to overlook the fact that he cut her vagina out, you need to overlook the fact that he cut her nipples off, you need to overlook the fact that he killed somebody else.

And my job was to defend [Stokes]. So what I did was I looked at every aspect of the case. If I was trying that case now, it would be a heck of a lot different because the tolerance we have now. But I would change nothing because they just wasn't tolerant of that.

J.A. 3524– 3525.

This testimony reveals that Sims and Johnson, in the exercise of their reasonable professional judgment, undertook a contemplative thought process about the pros and cons of using mitigation evidence of Stokes' childhood and upbringing. After doing so, they felt the circumstances of Stokes' crime were just too horrific for such evidence to be helpful. They decided not to introduce it.

They did, however, offer a different kind of mitigating evidence. They presented James Aiken, a prison adaptability expert, to testify about Stokes' ability to adapt to prison. Aiken's testimony was intended to dovetail with evidence concerning Stokes' AIDS diagnosis. Of course, Stokes' refusal to allow the AIDS evidence to be used made this strategy more challenging. But even without the AIDS evidence, Aiken emphasized that Stokes could be managed in a maximum-security environment for the rest of his life. Trial counsel used this testimony to argue that Stokes' life should be spared.

The jury was not convinced. They deliberated for 3 hours and 15 minutes before returning a death sentence finding four of the six aggravating factors alleged by the State to make Stokes eligible for the death sentence and recommended the death penalty.

44

## II.

Now, over two decades later, the majority grades trial counsel's strategic decisions about mitigation evidence as ineffective. In my view, that conclusion ignores the reality of trial work and conflicts with Supreme Court precedent.

Importantly, Stokes did not press the mitigation strategy in his state PCR efforts. Since he did not, he must satisfy *Martinez v. Ryan*, 566 U.S. 1 (2012), which "provides a narrow exception to the general rule . . . that errors committed by state habeas counsel do not provide cause to excuse a procedural default." *Gray v. Zook*, 806 F.3d 783, 788 (4th Cir. 2015). *Martinez* permits a petitioner to excuse certain procedurally defaulted ineffective-assistance-of-trial counsel claims. *Id.* at 789. But the petitioner must establish cause to excuse the procedural bar before the federal court will consider the merits of that defaulted claim. This standard reflects the "well-established principle that [f]ederal habeas courts reviewing the constitutionality of a state prisoner's conviction and sentence are guided by rules designed to ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism." *Owens v. Stirling*, 967 F.3d 396, 422 (4th Cir. 2020) (alteration in original) (internal quotation marks omitted).

Thus, Stokes must show that the underlying ineffective assistance of trial counsel claim is substantial, and that PCR counsel was deficient in not pursing that claim. *Id.* at 423. And if Stokes crosses those two hurdles, he must then show trial counsel was deficient and that the deficiency prejudiced his defense. While ordinarily I would address these issues in that order, here I will address them chronologically because this really is

45

somewhat of a chicken or the egg dilemma. PCR counsel could not have been ineffective unless trial counsel was as well. In my view, neither was defective.

A.

I begin with a discussion of Stokes' trial counsel because I do not believe that Stokes has shown a substantial underlying ineffective of assistance of counsel claim. Where a state prisoner claims ineffective assistance of counsel as the basis of habeas relief, the Court must also review the claim through the highly deferential lens of *Strickland v. Washington*, 466 U.S. 668 (1984). First, a petitioner must show counsel's performance was deficient and fell below an objective standard of reasonableness. *Id.* at 687–88. Second, the petitioner must show the deficient performance prejudiced the defense, meaning "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. But in considering these two factors, the bar is higher for strategic decisions. Much higher. Counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.*

Stokes' complaints involve classic strategic decisions that the Supreme Court has determined to be "virtually unchallengeable." Sims and Johnson—seasoned trial lawyers with experience trying capital cases in Orangeburg County—felt the personal mitigation evidence cut both ways. Despite the potential benefits of that evidence to humanize Stokes, there were risks. Their strategy throughout the trial was to admit guilt, portray the other

46

participants in the murder as more culpable than Stokes and ask for mercy. And they felt that jurors might view mitigating evidence as to Stokes' background as a poor excuse for him committing a gruesome murder. They questioned whether those jurors, from a poor county in South Carolina, many of whom may have had tough upbringings and life experiences, might take offense at the mitigating evidence. In other words, "the question at that point [was] whether or not putting out the background of the individual and the kind of life that they had had as a child would be effective in light of the facts of the case and the people that you had on the jury." J.A. 3472.

In weighing the pros and cons, Sims and Johnson evaluated how the trial was going. They had been with the jurors throughout the trial. They saw how the jury reacted to the opening statements and closing arguments and to the evidence presented. They also drew upon their knowledge of the community where the jurors lived. Recall that Sims and Johnson lived in that community too.

All of these things went into making the decision, that at that time, in that venue, with that jury, against the evidence that had been presented so far in that trial, they should not introduce certain mitigating evidence. Sims and Johnson made the choice—the excruciating choice—that the benefits of the mitigation evidence, in this situation, were not worth the risks.

To be sure, one could have a different view. Like the majority, one could conclude that in the face of the inevitably gruesome evidence about what Stokes did, the best chance to save his life was to attempt to humanize that conduct through the personal mitigation evidence. Maj. Op. at 28.

47

But trial counsel considered that approach. Their best judgment, sitting in counsel's chair with an appreciation of the dynamics at the moment, was that the mitigating evidence would do more harm than good. We are in no position to label that decision unreasonable. In fact, the Supreme Court has provided guidance in the context of similar arguments. Substituting Stokes for the petitioner in *Wong v. Belmontes*, 558 U.S. 15, 25 (2009), Stokes would argue for a "more-evidence-is-better" approach; "after all, what is there to lose?" "But here there was a lot to lose. A heavyhanded case to portray [Stokes] in a positive light, with or without experts, would have invited the strongest possible evidence in rebuttal—the evidence that [Stokes] was responsible for not one but two murders." *Id.* The Supreme Court tells us that we should not second guess those decisions.

Despite that, the majority engages in just that sort of second guessing, chastising Sims and Johnson about how they should have tried the case. According to the majority, the concern counsel identified "reflects a misunderstanding of the duty to mitigate. Trial counsel were not obliged to ask the jury to excuse Stokes's actions. Instead, their duty was to mitigate Stokes's 'moral culpability.'" Maj. Op. at 27. Remarkably, the majority goes on: "[i]f trial counsel believed the jury would not have responded well to a presentation that minimized Stokes's conduct, their duty was to find a way to convey this highly significant evidence without doing so." Maj. Op. at 29.

I agree with the majority that the purpose of mitigating evidence is not to excuse conduct, but to help place the moral judgment about the conduct in a context more favorable to the defendant. And in sociology classes, law review articles and even appellate court chambers, that distinction may seem clear. But in the fast-paced and intense context

48

of a trial, particularly one in which a defendant's life is in the hands of twelve jurors from the community, the line is blurry. Even if presented in the best way by the most capable of lawyers, it seems far from unreasonable for Sims and Johnson to be concerned that the jury would not accept that distinction. In my view, this is the exact type of strategic judgment to which we must defer. Indeed, *Strickland* tells us that. It counsels us to make every effort to "eliminate the distorting effects of hindsight" and to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ." *Strickland*, 466 U.S. at 689.

Likely recognizing the difficult hurdle of claiming ineffective assistance based on strategic decisions, Stokes tries to masquerade his criticism of those strategic decisions as criticism about preparation. He is right that without a reasonable investigation, counsel does not get the benefit of the strong deference we afford to strategic decisions. Seizing on that law, Stokes argues that trial counsel did not sufficiently investigate mitigation evidence and did not do so soon enough. Although the majority largely agrees with Stokes, in my view this argument also falls short. "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (internal quotation marks omitted). Capital sentencing counsel has an "obligation to conduct a thorough investigation of the defendant's background . . . to discover all reasonably available mitigating evidence," but the investigation need only be "*reasonably* thorough." *Owens*, 967 F.3d at 413 (internal quotation marks and citations omitted). We are to employ a highly deferential view of trial counsel's performance, recognizing the

49

dangers of second-guessing counsel's assistance after an adverse sentence and acknowledging there are "countless ways to provide effective assistance in any given case." *Strickland*, 466 U.S. at 689.

Here, as noted above, the record demonstrates the significant work that trial counsel and their team did in interviewing witnesses and working with experts to develop a trial strategy. As described above, trial counsel's investigative efforts involved interviewing a significant number of Stokes' family and friends to learn about his upbringing. Through those efforts, trial counsel learned extensive and specific information about the traumatic and abusive upbringing Stokes endured. While I recognize not every detail of mitigation evidence was discovered, that, of course, is not required. What is clear is that trial counsel's investigation went well beyond broad outlines of Stokes' childhood troubles.

This simply is not a situation where trial counsel overlooked "red flags" about Stokes in investigating their case. *Rompilla v. Beard*, 545 U.S. 374, 392 (2005). It is also not a case where trial counsel "did not even take the first step of interviewing witnesses or requesting records." *Porter v. McCollum*, 558 U.S. 30, 39 (2009). Indeed, trial counsel's investigative efforts here were more than sufficient, particularly when compared to the attorneys' work in *Bobby v. Van Hook*, 558 U.S. 4, 9–10 (2009) where the record there showed that counsel "looked into enlisting a mitigation specialist when the trial was still five weeks away" and were in touch with expert witnesses "more than a month before trial." The Supreme Court there found that trial counsel's performance was not constitutionally deficient in terms of the timing and scope of the investigation, and that

50

"even if . . . counsel performed deficiently by failing to dig deeper, [the defendant] suffered no prejudice as a result." *Id.* at 12.

Interestingly enough, the majority's analysis confirms that trial counsel's investigation went "beyond some investigations that have been deemed unreasonable." Maj. Op. at 26 n.9. It also rightly notes that counsel responded to that investigation by identifying witnesses who could have presented the personal mitigating evidence available. "[M]embers of Stokes's family and a social worker were prepared to testify. A neurologist and psychiatrist were prepared to testify about Stokes's HIV status, but presumably could have offered other personal testimony about Stokes instead." Maj. Op. at 27. The absence of mitigating evidence about Stokes' upbringing and childhood was not a matter of preparation, or lack thereof. It was the result of strategic decision-making by trial counsel in the thick of an intense trial.

In hindsight, one could argue that counsel could have done more. Hindsight, after all, is always twenty-twenty. But that is simply not the standard we apply here. "*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." *Wiggins v. Smith*, 539 U.S. 510, 533 (2003).

Trial counsel conducted the "reasonably thorough" investigation required of capital sentencing counsel. *Owens*, 967 F.3d at 413, 417 (finding no deficiency in counsel's mitigation team's efforts and further rejecting the complaint that counsel failed to present mitigating evidence within their possession, noting that counsel "judged with reasonable competence in avoiding such 'double-edged' evidence" (quoting *Gray*, 529 F.3d at 239));

51

*see also Strickland*, 466 U.S. at 691 (1984). With a thorough investigation of law and facts completed, we must credit counsel's exercise of reasonable professional judgment. *Strickland*, 466 U.S. at 690. One thing professional judgment teaches is that the evidence can cut both ways. Here, trial counsel thought the burdens outweighed the possible benefits. Stokes has not presented sufficient evidence to overcome the presumption of adequate assistance for trial counsel's strategic decisions.

B.

I turn now to Stokes' PCR counsel. Stokes claims that not only was his trial counsel ineffective, his PCR counsel was also. Like trial counsel, PCR counsel investigated mitigation evidence. They hired a mitigation investigator to conduct more interviews of family, friends, teachers and Stokes' ex-wife. That investigation also unearthed even more aggravating evidence against Stokes. They had the benefit of trial counsel's consultation with a social worker who was a part of Stokes' trial defense and had met with Stokes as well. But, Stokes' PCR counsel, like trial counsel, decided not to pursue the mitigation claim, focusing instead on an intellectual disability claim and an actual conflict of trial counsel claim, which they felt were the stronger claims.[*]

---

[*] Stokes claimed that trial counsel labored under an actual conflict of interest because the State's key witness at trial was Stokes' ex-wife. Trial counsel Sims prosecuted Stokes in his earlier assault case. Stokes claimed this conflict prejudiced him because Sims failed to explore several lines of inquiry in cross-examining Stokes' ex-wife during the sentencing phase allegedly due to this conflict. I am not convinced that trial counsel Sims labored under any actual conflict of interest. This issue was adjudicated below and as the district court recognized, the PCR court credited Sims' testimony that he knew Stokes' ex-wife would testify and his declaration that there was nothing in his earlier prosecution that would inhibit his defense. Sims testified that he had a theory in mitigation as to how to
(Continued)

52

Stokes claims in doing so, PCR counsel's assistance was ineffective. He claims that the mitigation issue should have been pressed. And as he and the majority note, PCR counsel now agree. In this collateral proceeding, PCR counsel conceded that they should have pursued the claim.

The testimony of PCR counsel certainly supports Stokes' claim. But their testimony as a whole must be considered from counsel's perspective at that time and without the "distorting effects of hindsight." *Strickland*, 466 U.S. at 689. And importantly, PCR counsel admitted that if they thought the ineffective assistance of counsel claim was strong, they would have presented that claim. In their own words, they "made some sort of judgment, explicit or implicit" in deciding not to pursue the referenced mitigation claim. J.A. 3259. That was the judgment at the time.

That testimony suggests that PCR counsel considered presenting mitigating evidence but decided against it. In other words, like trial counsel, they made a strategic decision not to include that and other claims that, at the time, they considered weaker. Instead, they felt the best approach was to focus only on the strongest claims.

Consistent with that conclusion, the record reveals that Stokes' pro se application for habeas relief includes the mitigating evidence issue. Then PCR counsel filed an

---

address the incident involving Stokes' ex-wife and noted that one of the issues he was trying to show was Stokes' remorse. As for his representation as a whole, when asked if he labored under a conflict Sims stated that "if I thought I couldn't have represented Mr. Stokes to the best of my ability I would not have been in the case." J.A. 1618.

amended application removing the mitigation issue. Removing an existing ground provides additional evidence of a conscious decision.

And let's not forget that PCR counsel are experienced death penalty lawyers. One of Stokes' PCR attorneys is currently a law professor and director of death penalty litigation at a law school who transitioned to that role after working almost exclusively on post-conviction and federal habeas cases while in private practice. He was trained in the development and presentation of mitigating evidence in death penalty cases and had done this work before. While even the best lawyers can make mistakes, PCR counsel's experience is even more evidence that counsel made a strategic decision not to pursue the mitigating evidence claim.

Finally, I find it significant that PCR counsel acknowledged "falling on [the] sword" for Stokes. J.A. 3044. In fairness, counsel admitted that in using that term, he meant "I didn't do as good a job as I should have." J.A. 3044. But to me, when considered in the context of his testimony as a whole, PCR's admission amounts to acceptance of responsibility in hindsight for a failed effort; not necessarily an effort that was ineffective at the time. In other words, PCR counsel, after his efforts proved unsuccessful, stated that he would have done things differently as he thought about that case several years later. Accepting that as true, it does not change the fact that PCR counsel, at the time, made a strategic decision to pursue the claims that they felt were the strongest. That view of the decision in hindsight is precisely what the Supreme Court has prohibited.

While one might reasonably say PCR counsel took the wrong approach in dropping the claim, it was hardly unreasonable. In presenting arguments, lawyers often debate

54

whether to pursue all potential arguments hoping one will stick—or to laser in on the best arguments because of concerns that the weaker ones may dilute the stronger ones. Reasonable minds can differ on that question. But the Supreme Court tells us that this approach is not unreasonable. "Even if some of the arguments would unquestionably have supported the defense, it does not follow that counsel was incompetent for failing to include them." *Yarborough v. Gentry*, 540 U.S. 1, 7 (2003). As is the case with almost any trial decision, "[f]ocusing on a small number of key points may be more persuasive…." *Id.* Thus, "[w]hen counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect." *Id.* at 8; *see also Workman v. Superintendent Albion SCI*, 915 F.3d 928, 942 (3d Cir. 2019) (discussing this presumption in an attorney's decision to pursue some claims and decline to pursue others as a tactical choice in relation to *Martinez*). Guided by *Strickland*, we must indulge the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689. Here, PCR counsel made a strategic decision to focus on other claims and that was reasonable under *Strickland*.

## C.

But even if Stokes could establish his trial counsel and his PCR counsel were deficient, he must show prejudice under *Strickland*. To show prejudice, a petitioner must demonstrate a reasonable probability that "at least one juror would have struck a difference balance" and voted against the death penalty after having heard additional available mitigation evidence. *Wiggins*, 539 U.S. at 537. "To assess that probability, we consider 'the totality of the available mitigation evidence—both that adduced at trial, and the

55

evidence adduced in the habeas proceeding'—and 'reweig[h] it against the evidence in aggravation.'" *Porter*, 558 U.S. at 41 (quoting *Williams v. Taylor*, 529 U.S. 362, 397–98 (2000)).

Considering the totality of the evidence, both aggravating and mitigating, I do not see where Stokes has "affirmatively prove[n] prejudice." *Strickland*, 466 U.S. at 693. Even crediting mitigating evidence derived from both trial counsel and PCR counsel's efforts and interviews, as well as potential testimony about Stokes' troubled childhood, neglectful parents, abuse, and trauma, and even if federal habeas counsel's child development expert testified, the aggravating evidence is simply overwhelming. It is hard to conjure a more horrific set of facts. The jury, of course, heard it all. They learned of how Stokes plotted several months in advance to murder Connie Snipes, a complete stranger, as he sat in a jail cell for having already committed yet another violent act. They heard testimony about the gruesome rape and murder of Connie. They learned that the murderers scalped her head, stabbed and mutilated her nipples and body, and cut her vagina out of her body. They heard the testimony of a forensic pathologist and then saw the graphic pictures of Connie's mutilated and dismembered body. They heard that Stokes committed another horrific murder mere days later. They also heard about his criminal history and that he assaulted his ex-wife and served prison time for that conduct. And on top of it all, Stokes wrote a letter admitting to much of the detail about his role in the murders of Connie and Doug Ferguson. That letter is laced with profanity, graphic and detailed in nature, but shows little remorse—"[t]elling their family sorry would only make them hate me more." J.A.1225.

56

In light of this overwhelming evidence, I do not see how Stokes satisfies his burden or how any additional expert or fact testimony about his upbringing and difficult childhood would outweigh the gruesome and horrific nature of Connie Snipes' murder. Stokes and the majority rightly note that the relevant question is whether "there is a reasonable probability that at least one juror would have struck a different balance." *See Wiggins*, 539 U.S. at 537. But that does not mean we compromise our objective analysis or decline to view the evidence "taken as a whole." *Id.* at 538. If we do, we water down the prejudice requirement to something akin to anything is possible. *See Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (noting that a reasonable probability sufficient to undermine confidence in the outcome requires a "'substantial' not just 'conceivable,' likelihood of a different result"). That, however, is exactly what Stokes asks us to do. His argument boils down to conjecture, speculating that it just takes one juror; so, the mitigating evidence could have made a difference. Of course, it could have. Anything could have made a difference. That is not, however, the approach the Supreme Court requires. Stokes must show that there is a "*reasonable probability* that at least one juror would have struck a different balance." *Wiggins*, 539 U.S. at 537 (emphasis added). A reasonable probability is one "sufficient to undermine confidence in the outcome" but in the capital sentencing context, this means whether the sentencer would have concluded that the "balance of aggravating and mitigating circumstances did not warrant death." *Owens*, 967 F.3d at 412 (internal quotation marks omitted). Objectively considering the facts here, there is no basis to conclude that presenting the mitigating evidence would have had any effect on the outcome of Stokes' sentence.

## III.

In my view, the record does not support the conclusion that the choice Sims and Johnson made was unreasonable. It does not support the conclusion that PCR counsel was unreasonable. But the record does support the district court's conclusion that even if we are to conclude that their representation was deficient, Stokes faced no prejudice because of the overwhelming and horrific aggravating evidence before the jury. Therefore, I respectfully dissent.